J-S23031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.A., MOTHER | : | No. 506 EDA 2023 |

Appeal from the Order Entered February 1, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000868-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: R.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.A., MOTHER | : | No. 507 EDA 2023 |

Appeal from the Order Entered February 1, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000869-2022

BEFORE:  PANELLA, P.J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED AUGUST 29, 2023**

Appellant, T.A. ("Mother"), appeals from the order entered in the Philadelphia County Court of Common Pleas, which dismissed the dependency petitions filed by the Philadelphia County Department of Human Services ("DHS") and transferred legal and physical custody of her minor children, R.A.

(daughter) and M.A. (son) (collectively, "Children"), to I.W. ("Father"). We affirm.

The relevant facts and procedural history of this case are as follows. Mother and Father are the natural parents of R.A., who was born in January 2012, and M.A., who was born in June 2013. Shortly after M.A.'s birth, Mother and Father's relationship deteriorated. While Father moved to Ohio, Children remained in Pennsylvania with Mother.

On September 1, 2022, DHS received a General Protective Service ("GPS") report alleging that Mother had been hospitalized after suffering a bone infection. (**See** Dependency Petition for M.A., filed 10/3/22, at ¶b). After Mother was discharged from the hospital, she "had physical limitations that affected her ability to care for" Children. (**Id.**) The report also alleged that Mother might have been abusing prescription pain medication, and she had not enrolled Children in school for the 2022-2023 academic year.

On September 2, 2022, DHS employees went to Mother's residence for further investigation. Upon arrival, DHS employees observed Mother "to be confused and disoriented[.]" (**Id.** at ¶c). Although Children appeared to be safe, the home was cluttered with "multiple cigarette butts strewn on the floor" and "cigarette burns on [Mother's] sheets[.]" (**Id.**) Mother kept open pill bottles within Children's reach. Mother also confirmed that she had yet to enroll Children in school, and Children "had not attended school since the family moved to Philadelphia [from Johnstown] in December 2021." (**Id.**)

While the DHS employees spoke with Mother, her "behavior became increasingly erratic, and she became verbally abusive toward DHS." (*Id.*)

DHS subsequently contacted D.L. and T.L. ("Maternal Grandparents"), who agreed to care for Children while Mother "addressed the condition of her home and sought appropriate services for herself." (*Id.* at ¶d). Mother's in-home services commenced on September 7, 2022. On September 9, 2022, during a "Crisis Rapid Response Family Meeting," DHS determined that Mother had untreated mental health issues. (*Id.* at ¶g). DHS also confirmed that Mother was abusing her prescription medications. Considering Mother's condition, DHS contacted Father on September 14, 2022. At that time, Father stated "that he shared custody of the children with [Mother]; that he was in agreement with [Children] residing with [Maternal Grandparents] through a Safety Plan; and that he wanted to seek full custody of the children." (*Id.* at ¶i).

On October 3, 2022, DHS filed separate dependency petitions for Children. The court conducted an adjudicatory hearing on February 1, 2023. At the hearing, the court received testimony from the DHS social worker, the Community Umbrella Agency ("CUA") case manager, Father, and Mother. Additionally, the guardian *ad litem* entered Father's "secure criminal court summary" into evidence. (N.T. Hearing, 2/1/23, at 144). At the conclusion of the hearing, the court found that DHS presented clear and convincing evidence to warrant an adjudication as to Mother. (*See id.* at 151). The court

also found that Father "is ready, willing, and able to care for these children." (*Id.* at 152). Thus, the court entered an order dismissing the dependency petition and transferring legal and physical custody of Children to Father. On February 27, 2023, Mother timely filed separate notices of appeal and concise statements of errors. This Court consolidated the matters *sua sponte* on March 22, 2023.

Mother now raises two issues for our review:

> Whether the trial court committed reversible error when the trial court did not adjudicate [Children] dependent and commit them to [DHS], where an adjudication of dependency and [commitment] to DHS was supported by clear and convincing evidence under the Pennsylvania Juvenile Act, 42 Pa.C.S. §§ 6301-6365.
>
> Whether the trial court committed reversible error when the trial court placed [Children] in the legal and physical custody of [Father], where such determination was not supported by clear and convincing evidence under the Pennsylvania Juvenile Act, 42 Pa.C.S. §§ 6301-6365.

(Mother's Brief at 8).

Mother's issues are related, and we address them together. Initially, Mother concedes that she "is not appealing the adjudication of dependency as to her," and her arguments are "limited to the transfer of the physical and legal custody of" Children to Father. (*Id.* at 12). Regarding custody, Mother insists that the record did not support the court's decision to transfer custody of Children to Father. Mother emphasizes a DHS policy requiring that each child should have their own bedroom. Nevertheless, Father testified that he lives in a two-bedroom apartment. Although Father testified that he is willing

to sleep on a sofa for Children to have separate bedrooms, Mother maintains that there is no way to ensure this will happen where the record does not mention whether "the State of Ohio and the appropriate county agency was going to pick this case up for supervision[.]" (*Id.* at 14). Mother also argues that: 1) DHS did not obtain Father's criminal history from Ohio; 2) Father failed to provide specific testimony about his plans for childcare; 3) Father's relationship with Children was fractured due to Father's move to Ohio; and 4) Children did not want to live with Father. Under these circumstances, Mother asserts that the transfer of custody to Father is not in Children's best interests. Mother concludes that this Court must reverse the order that transferred custody. We disagree.

The applicable scope and standard of review for dependency cases is as follows:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the [trial] court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re A.B.*, 63 A.3d 345, 349 (Pa.Super. 2013) (quoting *In re R.J.T.*, 608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)).

> We accord great weight to this function of the hearing judge because [the court] is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before [the court]. Relying upon [the court's] unique posture, we will not overrule [its] findings if they are supported by competent evidence.

*In re A.H.*, 763 A.2d 873, 875 (Pa.Super. 2000).

The Juvenile Act defines a dependent child, in pertinent part, as follows:

### § 6302.  Definitions

\* \* \*

**"Dependent child."**  A child who:

(1)   is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his [or her] physical, mental, or emotional health, or morals.  A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302.

A court may adjudicate a child as dependent if the child meets the statutory definition of a dependent child by clear and convincing evidence. *See In re E.B.*, 898 A.2d 1108, 1112 (Pa.Super. 2006).

If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

The definition of a dependent child contained in section 6302 clearly states that a child must lack a parent, guardian or other legal custodian who can provide appropriate care to the child.  A child whose non-custodial parent is ready, willing and able to provide such care does not meet this definition.

*    *    *

> The plain language of the statutory definition of a dependent child compels the conclusion that a child is not dependent if the child has a parent who is willing and able to provide proper care to the child. When a court adjudges a child dependent, that court then possesses the authority to place the child in the custody of a relative or a public or private agency. Where a non-custodial parent is available and willing to provide care to the child, such power in the hands of the court is an unwarranted intrusion into the family. Only where a child is truly lacking a parent, guardian or legal custodian who can provide adequate care should we allow our courts to exercise such authority.

*In re M.L.*, 562 Pa. 646, 649-50, 757 A.2d 849, 850-51 (2000). "In other words, if a dependency petition is filed against the custodial parent and there is sufficient evidence for the court to adjudge the child dependent but for the intervention of the non-custodial parent who is willing and capable of caring for the child, the trial court may properly grant custody to the non-custodial parent in a dependency proceeding." *Interest of J.B.*, 247 A.3d 447, 453 (Pa.Super. 2021).

Instantly, Father testified regarding his current circumstances, as well as his history with Mother and Children. Father explained that he and Mother separated in 2013 or 2014, after the birth of M.A. In 2016, Father sought custody of Children. The court initially provided Father with supervised visits.[1]

---

[1] Father mentioned that the court had ordered supervised visitation because "the allegations came up about me." (*See* N.T. Hearing at 87). These allegations were addressed in greater detail by Calli Hagan, the DHS social
*(Footnote Continued Next Page)*

When Children failed to appear for the visits, the court issued a bench warrant for Mother. Although the warrant remained active, Father moved to Cincinnati, Ohio and kept tabs on Children by calling other family members.

At the time of the hearing, DHS had confirmed that Father lived in an apartment, which was across the street from the school that Children would attend. Authorities in Ohio conducted a home assessment and "cleared it" for Children to occupy. (N.T. Hearing at 20). Although Father did not have the necessary furniture to furnish Children's rooms, he "talked about buying beds and dressers for them." (*Id.* at 21). Father also testified that: 1) he did not have a criminal record for child abuse; 2) he held a steady job; 3) he was willing to take custody of Children; 4) Children could be added to his health insurance plan; and 5) he would take Children to all medical and dental appointments.

---

worker. Specifically, DHS received a report on October 25, 2022, which alleged that Father had raped R.A. in 2017. (*See id.* at 17). Although DHS investigated in 2017, Ms. Hagan investigated the matter again in 2022. During the 2022 investigation, R.A. was interviewed by the Philadelphia Children's Alliance ("PCA"). In this interview, R.A. "did disclose that it happened, but she would not give any other details regarding the incident." (*Id.*) Ms. Hagan also reviewed R.A.'s 2017 PCA interview, where R.A. "also said that it did happen, but she didn't give any further information." (*Id.*) DHS interviewed Father, who denied the allegations. Father believed that Mother told R.A. to make the allegations in 2017, because Mother and Father "had a falling out and they didn't have a very good relationship at the time." (*Id.* at 19). Ultimately, DHS found the report to be unfounded. Ms. Hagan expressed concerns that Mother had coached R.A., because R.A. "said that mom told her what to say." (*Id.* at 22-23).

On cross-examination, Father stated that DHS had recently facilitated visitation for him with Children. Prior to DHS's involvement, however, Father had not seen Children for approximately six years. (*See id.* at 95). Father indicated that Maternal Grandparents permitted him to have telephone contact with Children "about once or twice a week[.]" (*Id.* at 94). In speaking with Maternal Grandparents, Father developed the following plan for reuniting with Children:

> So the kids are in school for the first time in their life, and they seem to be doing better with the help of ya'll, [the CUA case manager and DHS Social Worker]. They helped my children get in school for the first time along with [Maternal Grandparents]. I consented for [Maternal Grandparents] to get [Children's] birth certificates and their socials so they can enroll them in school.
>
> So as a father I love my children. I don't want to disrupt my children's life anymore that it already is. So my plan with [Maternal Grandparents] is that the kids stay there until the end of the school year. You know what I'm saying.
>
> \* \* \*
>
> But if there's any complications because of them staying out, I'm willing to take my children right now.

(*Id.* at 96).

At the conclusion of testimony, the court received argument from counsel. The child advocate expressed Children's preferences. Regarding M.A., the child advocate asserted that "[h]e has told me actually on two separate occasions today that he would be willing to go to Ohio." (*Id.* at 142). M.A. "also vacillated and said … 'I want to be with my dad and my mom.'"

(*Id.*) Regarding R.A., she initially told the child advocate "she was all right to go to Ohio." (*Id.* at 143). R.A. "quickly recanted," and she indicated a desire to stay in Philadelphia. (*Id.*) R.A. remained "willing to visit" Father in Ohio. (*Id.*)

Thereafter, the guardian *ad litem* entered a summary of Father's Pennsylvania criminal history into evidence. The summary revealed a juvenile adjudication for a drug charge, a 2013 conviction for driving under the influence of alcohol, and several arrests that did not result in prosecution. (*See id.* at 144-45). Based upon these arrests, the last of which occurred in 2015, the guardian *ad litem* argued that Father lacked the ability to parent Children:

> But what disturbs me and what indicated to me that [F]ather doesn't have the present ability to care for these children is his arrest record. We deal with behaviors in this court. We have a different standard of proof. We don't have to prove these allegations beyond a reasonable doubt. Past behaviors are an indication. They are indicia of a present ability to care for children.
>
> Now I wouldn't be making this argument except for the sheer number of arrest[s] that the father has had and for the different types of crimes he's had.

(*Id.* at 145).

The court analyzed the record and concluded that Father was available and willing to care for Children:

> Notwithstanding the court's determination of present inability on the part of Mother, the trial court heard credible clear and convincing evidence to establish that Father was ready, willing and able to care for the children. Father is

employed and supplied the CUA case manager with his proof of income. Father's home was assessed and deemed appropriate for the children, and Father is willing to accept voluntary services for the children if needed. Father lives directly across the street from the children's potential school and has maintained consistent contact with the CUA case manager. Father did not present an inability to care for the children and is willing, ready, and able to maintain proper care and control over the children. To the contrary, Father demonstrated the ability to immediately care for the children and the absence of any dependency issues in his home.

[The guardian *ad litem*] moved into evidence, Father's secure criminal court summary. [The guardian *ad litem*] argued Father's arrests from 2002, 2009, 2010, and 2015 displayed a pattern for arrests and criminal activity. However, each of these arrests were withdrawn or dismissed. The court found this argument to be unpersuasive and egregious. Father's arrest record is not evidence of an inability to care for these children. Father's only conviction of driving under the influence was nearly ten years ago. The legal system is built on the foundation that people are innocent until proven guilty.

(Trial Court Opinion, filed 3/29/23, at 9) (internal citations omitted). The court also found "sufficient evidence supported the finding that the children should be placed with Father and that it would be contrary to their welfare and best interests to commit them to DHS at this time." (**Id.** at 10).

Here, the court credited the testimony demonstrating that Father is willing and capable of caring for Children. Our review leads us to conclude that competent evidence supported the court's findings. **See In re A.H., supra**. Therefore, we cannot say that the court abused its discretion by placing Children in Father's custody after it found sufficient evidence to

adjudge Children dependent as to Mother.  ***See Interest of J.B., supra***; ***In re A.B., supra***.  Accordingly, we affirm.

      Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>8/29/2023</u>